## Walker v. Saricks, Appellant.

Argued November 11, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Walter M. Swoope,* with him *A. R. Chase* and *Chase & Swoope,* for appellant.

*James K. Nevling,* with him *Boulton, Nevling & Davis,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, January 3, 1949:

This appeal involves the construction of a written contract. Plaintiff (appellee) instituted an action of assumpsit to which defendant (appellant) filed an amended affidavit of defense and new matter. Plaintiff filed a reply to the new matter and moved for judgment on the pleadings under Rule 1034 of the Rules of Civil Procedure. The court below entered its order sustaining

the motion. This appeal followed. The admitted facts are as follows:

Prior to August 21, 1945, the plaintiff was the lessee of a siding on the Pennsylvania Railroad at or near Mahaffey, Clearfield County, Pa., known as the Troy No. 10 siding. He erected tipple and dumping facilities at this point. He also possessed a strip mining lease on real estate known as the Paul Duff property at Clover Run, Pa. The defendant was engaged in strip mining nearby and had his own siding facilities on the Clover Run branch of the Pennsylvania Railroad. On August 21, 1945, plaintiff and defendant entered into a written contract providing, inter alia, as follows: "J. D. Walker, [Plaintiff] party of the first part, owning tipple and siding facilities at Mahaffey, Pa., and a coal stripping operation on the Paul Duff property at Clover Run, Pa., and it being planned to dump and ship the said coal at Mahaffey, Pa., and J. G. Saricks, [Defendant] having leased coal and developing a siding and stripping operation along the Clover Run Railroad, it being close and nearby the J. D. Walker operation, desires for economical reasons to operate both propositions and agrees hereby to compensate J. D. Walker in the following manner for discontinuing his operation. . . ." Under the terms of the contract, compensation was to be paid to plaintiff at the rate of five cents per ton on thirty-three and one-third percent of all the coal *"put over both tipples and sidings"* unless more than one-third of all the coal was marketed *over plaintiff's tipple and siding* at Mahaffey *in which case* plaintiff was to receive five cents per ton on all coal marketed over this siding. The contract also contained the following provisions with relation to the plaintiff's siding at Mahaffey:

1.—That defendant would surrender possession of the siding in the event he discontinued operations in the Clover Run area and in the event no coal was loaded

over either siding for a period of thirty days, this right being optional on the part of plaintiff to accept or reject same.

2.—That defendant would pay the siding rental, repairs, taxes and insurance while in possession.

3.—That failure of the Railroad Company to comply with conditions contained in the agreement should not make plaintiff liable for damages.

Upon execution of the contract, plaintitff assigned the Paul Duff lease to defendant and defendant went into possession of the Troy No. 10 siding. Plaintiff was paid in accordance with the terms of the contract until April 1, 1946. Defendant refused to make payment for any tonnage loaded thereafter because on that date the railroad cancelled the plaintiff's rights in the Troy No. 10 siding and thereafter plaintiff sold his tipple to a third person. Defendant contends that the discontinuance of the right to use the siding and the sale of the tipple excused him from further performance under the contract.

In this appeal, defendant invokes the doctrine of *implied conditions*, whereby a contract may be discharged through subsequent impossibility of performance. He relies upon the principle enunciated in *Wertz v. Klinger*, 25 Pa. Superior Ct. 523, 526, viz: ". . . where a contract is entered into of a continuing character, or to be performed at a future time, dependent upon the continuing existence of a particular person or thing, or the continuing ability of the obligor to perform, . . . subsequent death, destruction, or disability will excuse the obligor from compliance with the terms of the contract."

Defendant asserts that under the terms of the written contract is the implied condition that the duty of defendant to perform continues only as long as the right to use the Troy siding and tipple continues. When

the railroad cancelled plaintiff's lease to the siding and when he subsequently sold the tipple, defendant claims that his performance was rendered impossible. Defendant maintains that the contract is ambiguous and testimony should be taken in order to show the surrounding circumstances under which it was executed. The learned court below held that the written contract was *not* ambiguous and therefore parol testimony to establish implied conditions, which would thus contradict or vary the terms of the written contract, should not be received. This was a correct ruling.

This Court said in *Gianni v. R. Russell & Co., Inc.*, 281 Pa. 320, 323, 126 A. 791: "Where parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement: Martin v. Berens, 67 Pa. 459, 463; Irvin v. Irvin, 142 Pa. 271, 287. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence: Union Storage Co. v. Speck, 194 Pa. 126, 133; Vito v. Birkel, 209 Pa. 206, 208." See also: *Regional Agricultural Credit Corp. v. Barabas*, 159 Pa. Superior Ct. 402, 48 A. 2d 85; *Hambleton et al. v. Hartman et ux.*, 160 Pa. Superior Ct. 447, 51 A. 2d 511. In *McCormack v. Jermyn*, 351 Pa. 161, 40 A. 2d 477, Mr. Justice HORACE STERN said, p. 166:

"A verbal agreement differs from a written one in this, that in the construction of the latter all negotiations leading up to the contract are presumed to be merged in the writing; moreover, oral testimony is not admissible to explain the written document in the absence of an ambiguity requiring such explanation." See

also: *Barnsley v. Shaffer et al.*, 358 Pa. 415, 57 A. 2d 870. Whether the writing is the entire contract between the parties so that the parol evidence rule is applicable is a question of law for the court: *Lester v. Century Indemnity Company*, 356 Pa. 15, 19, 50 A. 2d 678, and cases therein cited.

An analysis of the contract in question discloses no ambiguity. The first part of the writing refers to the "J. D. Walker operation." The contract provides that defendant "agrees . . . to compensate J. D. Walker . . . for discontinuing his operation." The term *"operation"* as used in this contract embraced more than the mere right to use a siding and tipple. The agreement *recites* that plaintiff owned *"a coal stripping operation on the Paul Duff property at Clover Run"* and certain rights in a railroad siding. When plaintiff promised to "discontinue his operation" by written agreement, he gave up an important property right. The complaint states, and it is admitted in the amended answer, that plaintiff did assign the Paul Duff lease to defendant pursuant to the contract. Defendant therefore possesses certain mining rights which were assigned to him by plaintiff. This was the *material* part of the consideration given by plaintiff. That this is what the parties contemplated becomes even more apparent when the manner in which plaintiff was to be compensated is examined. The contract provided that plaintiff was to receive five cents per ton on at least one-third of all coal carried over *both* sidings. This would be so whether or not *any* coal was ever carried over the Troy No. 10 siding. The only time, according to the terms of the contract, that the amount of coal carried over the Troy siding would become important would be when more than one-third of all coal hauled over both sidings was carried over the Troy siding, for which, as stated above, plaintiff was to be compensated at the rate of five cents per ton on all coal shipped over this siding. It is clear

the consideration given by plaintiff to defendant was *not* the right to use the Troy siding, *but the right to operate plaintiff's strip mining lease.* As was said in *Sentry Safety Control Corp. v. Jaybee Amusement Company, Inc.*, 111 Pa. Superior Ct. 318, 326, 327, 169 A. 419: "The parties themselves have made their own contract and the function of the court is to interpret and enforce it as it has been written, and not to write into it terms not contained therein." This has been the rule in Pennsylvania since *Duncan and Keiffer v. Keiffer,* 3 Binn. 126.

Professor Williston, in his treatise on contracts, says: "Under the doctrine of so-called implied conditions the court must seek the intention of the parties. It is trying to interpret the contract, that is, to find its meaning at the time it was made; and, having found that meaning, to enforce the contract according to that meaning whatever circumstances may afterwards arise." Williston on Contracts, Vol. Three, Revised Edition, Sec. 815, pp. 2295, 2296. It is clear that the parties never intended that performance by defendant should be excused by the withdrawal of the railroad company of plaintiff's right to use the Troy siding. The defendant still continues to possess the right to operate the strip mining facilities given up by plaintiff.

In the cases relied upon by defendant where impossibility will excuse performance, *it was the destruction of the thing on which the continuance of the contract depended that rendered further performance impossible.* Under those circumstances the promisor is excused from liability. In the present case, however, *the right to strip mine coal under plaintiff's assigned lease still continues* and is therefore still in existence.

Judgment affirmed.